UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JAMES ORIOLES, | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 11-30004-MAP |
| | ) | |
| | ) | |
| MASS MUTUAL FINANCIAL GROUP, | ) | |
| MARK VIVIANO, AND MATT | ) | |
| SCANLON, | ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS (Document No. 14)
September 6, 2011

NEIMAN, U.S.M.J.

Presently before the court are three claims arising from an employment dispute

between James Orioles ("Plaintiff"), on the one hand, and Mark Viviano ("Viviano"), Matt

Scanlon ("Scanlon"), and Mass Mutual Financial Group ("Mass Mutual") (together,

"Defendants"), on the other.[1]  Count One, breach of the covenant of good faith and fair

dealing, is asserted against Mass Mutual.  The remaining two counts, intentional

interference with advantageous business relations (Count Two) and intentional infliction

of emotional distress (Count Three), target both Viviano and Scanlon.  Defendants have

collectively moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).

---

[1]Mass Mutual Financial Group is listed as a defendant in the complaint, but
Defendants' Motion for Judgment on the Pleadings states that Mass Mutual was
incorrectly named as a defendant and the proper entity is MML Investor Services, a
wholly owned subsidiary of Mass Mutual.

Defendants' motion has been referred to this court for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons which follow, the court will recommend that Defendants' motion be allowed in part and denied in part.

I. Background

Plaintiff worked as an Internal Control-Data Management Consultant within Mass Mutual's broker-dealer, MML Investors Services Inc., ("MMLISI"), a wholly owned subsidiary of Mass Mutual Financial Group, from July 1, 2001, until he was terminated on January 14, 2010.  While working for MMLISI, Plaintiff was never subject to any disciplinary action and his work performance received positive company and divisional recognition.

On November 20, 2009, Plaintiff and other managers of MMLISI's New Business Unit received a draft report of a recently conducted procedural review.  Plaintiff's standard practice when he received such reports was to scan them, print them, and then save them to his computer.  At the time of the November 20th draft report, however, Plaintiff was out of the office on vacation; he received it when he returned on December 3, 2009.  On December 17, 2009, Plaintiff forwarded the draft report, along with a meeting request, to managers of the New Business Unit to review the findings, a process which, according to Plaintiff, occurs between twenty and thirty times a year. After the meeting, Plaintiff provided a copy of the draft report to a colleague for review and editing.  Upon reviewing the draft report, the colleague became aware and informed Orioles of three typographical errors in the two page report: the words (1) "tested" spelled as "testes," (2) "detailed" spelled as "derailed," and (3) "variable" spelled as "venereal."

2

After being notified of these errors Plaintiff, in adherence with the company code of conduct, contacted Scanlon, his supervisor, and Viviano, the Assistant Vice President of Operations, for directions.  Both Scanlon and Viviano determined that the errors should not be corrected and the report should be left as is, apparently basing such advice on a general directive not to correct or alter reports.  On January 4, 2012, the Director of Policy and Procedures informed the Director of Compliance that the report had been issued with typographical errors; the Director of Compliance reviewed the error-ridden report and alleged to the Associate Director of Internal Controls that Plaintiff purposefully altered the document.  In response, Plaintiff provided all known correspondence, copies and original documents, including report drafts, emails and meeting requests from his system.  A meeting thereafter took place on January 6, 2010, between several individuals, including Scanlon and Viviano, to discuss the allegations against Plaintiff.  At the conclusion of the meeting, those present concluded that all parties were aware of the typographical errors and that they would remain uncorrected; those present also determined that the errors were an intentional act, not simply errors in typing.

Shortly after the January 6th meeting, Plaintiff met with Bill Monroe, the president of MMLISI, and explained that, although he had no knowledge of the origination of the alterations, he took responsibility for the errors due to his "ownership" of the process. Plaintiff also expressed his belief that the errors were the result of an automated spell check or a practical joke by colleagues known as "blasting," in which co-workers send emails from other employees' accounts as a "got ya tactic" for not locking one's computer.  (Compl. ¶¶ 16, 40.)  Following his meeting with Monroe, Plaintiff received a

3

telephone call from a co-worker who informed him that he had personally witnessed
Scanlon in Plaintiff's office while he was on vacation and that Scanlon appeared to be
working on system applications other than email on Plaintiff's computer.

On January 8, 2010, Plaintiff attended a meeting with Human Resources at
which he repeated his knowledge and understanding of the typographical errors, along
with his explanation and evidence of multiple "blasting" pranks.  At the conclusion of the
meeting, Plaintiff was directed to leave the premises on paid suspension.  On January
14, 2010, Plaintiff was terminated due to the results of the internal investigation
regarding the altered document.  Plaintiff claims that no other employees were
disciplined for their alleged involvement in document alterations.

## II. STANDARD OF REVIEW

Fed. R. Civ. P. 12(c) allows a party, after the pleadings are closed, to move for
judgment on the pleadings.  *See Rivera-Gomez v. de Castro*, 843 F.2d 631, 635 (1st
Cir. 1988) (internal citations omitted).  The standard for evaluating a motion for
judgment on the pleadings is the same as that for a motion to dismiss under Rule
12(b)(6).  *See Remexcel Managerial Consultants, Inc. v. Arlequin*, 583 F.3d 45, 49 n. 3
(1st Cir. 2009).  As with a motion to dismiss, to survive a motion for judgment on the
pleadings a complaint must allege enough facts so that the claim is "plausible on its
face," *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56, 570 (2007), *i.e.*, the factual
content pled should "allow[] the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949
(2009).

The First Circuit has recently provided guidance as to the application of both

4

*Twombly* and *Iqbal*.  *See Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 8-13 (1st Cir. 2011).  After describing *Twombly* and *Iqbal* in detail, the First Circuit distilled certain principles.  First, "[d]ismissal of a complaint pursuant to rule 12(b)(6) is inappropriate if the complaint satisfies Rule 8(a)(2)'s requirement of 'a short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2)."  *Id.* at 11.  Second, "[a] 'short and plain' statement needs only enough detail to provide a defendant with 'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.* at 12 (quoting *Twombly*, 550 U.S. at 555 and citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  "In short," the First Circuit explained, an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim."  *Id.*

Again citing both *Iqbal* and *Twombly*, the First Circuit goes on to describe how a court shall employ a two-pronged analytical approach, essentially culling mere legal conclusions in a complaint, *i.e.*, "threadbare recitals" of the elements of a cause of action, from non-conclusory factual allegations which "must then be treated as true, even if seemingly incredible."  *Id.*  The First Circuit also directs that a court "may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Id.*  (quoting *Twombly*, 550 U.S. at 556).  "Nor," the First Circuit continues, "may a court attempt to forecast a plaintiff's likelihood of success on the merits."  *Id.* at 12-13.  Rather, the First Circuit concludes, "a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely."  *Id.* at 13 (quoting *Twombly*, 550 U.S. at 556).

III.  D\ISCUSSION

A.  Breach of the covenant of good-faith and fair dealing (Count One)

In his complaint, Plaintiff alleges that Mass Mutual breached its covenant of good faith and fair dealing by terminating him in bad faith in order to "thwart his ability to earn accrued bonus."  (Compl. ¶ 50.)  As a result, Plaintiff seeks compensatory damages, emotional distress damages, punitive damages, and attorney's fees and costs.

The parties agree that Massachusetts law provides employers with "an unfettered right" to terminate at-will employees.  *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 7 (1st Cir. 2003).  Moreover, there is no dispute here that Plaintiff was an at-will employee.  Under the covenant of good faith and fair dealing, however, a discharged at-will employee may recover "unpaid compensation if the employee [was] terminated in bad faith and the compensation is clearly connected to work already performed."  *Artuso v. Vertex Pharmaceuticals, Inc.*, 637 F.3d 1, 8-9 (1st Cir. 2011) (citing *Harrison v. NetCentric Corp.*, 744 N.E.2d 622, 629 (Mass. 2001)).  As its name implies, an essential element of this cause of action is bad faith, which must be supported by facts, not merely allegations, in a complaint.  *Id.* at 9 ("While an allegation of 'bad faith' is in a sense a factual allegation, it is so subjective that it fails to cross 'the line between the conclusory and the factual.'  Such a bare-boned allegation cannot, without more, defeat a motion to dismiss for failure to state a claim.").  Moreover, the complaint must allege facts that tie the denial of a bonus or some other accrued benefit directly to the employer's bad faith.  *Id*.

Plaintiff explains in his supporting memorandum that his "accrued bonus" was to be based on past performance, *i.e.*, reviews, testing, evaluation, and reporting on internal controls, for which he would have been compensated at the end of the prior year.  Although not particularly clear in his complaint, the allegation of an "accrued"

6

bonus is enough, in the court's estimation, to consider the allegation as applying to a past benefit rather than a future benefit.  In any event, citing *Siles v. Travenol Laboratories*, 433 N.E.2d 103, 106 (Mass. App. Ct. 1982), Plaintiff goes on to argue that bad faith may be manifested in the unjust enrichment realized by an employer as a result of the employee's termination.  The court there made clear, however, that an enforceable claim for a bad faith termination must show that "the discharge involved an intent of the defendant to benefit financially at the plaintiff's expense."  *Id.*  (affirming trial court's allowance of defendant's motion for judgment notwithstanding the verdict).

Although Plaintiff's allegations of bad faith in his complaint are thin, they are sufficient, in this court's opinion, to state a plausible claim upon which relief may be granted.  *See Ocasio-Hernandez*, 640 F.3d at 13-14 ("[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if . . . a recovery is very remote and unlikely.").  Specifically, Plaintiff's allegations that meetings about the draft report were held, in which all present determined a course of action that called for leaving the documents uncorrected, are enough for the court to infer, at this nascent stage of the proceedings, that the decision to terminate Plaintiff could have been in bad faith.  That fact, in addition to the existence of a bonus earned but not paid, sufficiently alleges a claim for breach of the covenant of good faith and fair dealing.  In effect, Count One contains "sufficient factual matter" to state a claim for relief that is both actionable as a matter of law and "plausible on its face."  *Iqbal*, 129 S.Ct. at 1949 (quoting *Twombly*, 550 U.S. at 570.)  Accordingly, this court will recommend that Defendant's motion as to Count One against Mass Mutual be denied.

7

B.  Intentional Interference with Advantageous Business Relations (Count Two)

Count Two, intentional interference with advantageous business relations, is leveled against both Scanlon and Viviano.  A claim for intentional interference with advantageous business relations requires a plaintiff to show that (1) he had a business relationship, (2) the defendant knew of this relationship, (3) the defendant intentionally and maliciously interfered with the relationship, and (4) the defendant's actions harmed the plaintiff.  *See Zimmerman v. Direct Federal Credit Union*, 262 F.3d 70, 76 (1st Cir. 2001) (affirming district court's denial of motion for judgment as a matter of law following a jury verdict in factor of plaintiff).  While an employee may not sue an employer for intentional interference with its own contract, a supervisor may be personally liable if he tortiously interferes with a subordinate's employment relationship.  *Id*.

The only element apparently disputed by Defendants is the third, intentional and malicious interference, which must rise to the level of "actual malice" and be the "controlling factor" in a defendant's interference.  *See Sklar v. Beth Israel Deaconess Medical Center*, 797 N.E.2d 381, 385 (Mass. App. Ct. 2003) (affirming trial court's allowance of defendant's motion for summary judgment).  "Actual malice, in turn, is determined by the defendant's state of mind - - namely, whether the defendant had a 'spiteful, malignant purpose, unrelated to the legitimate corporate interest' of the employer."  *Id*.  (quoting *Weber v. Community Teamwork, Inc*., 752 N.E.2d 700, 715 (Mass. 2001).  A plaintiff, to succeed in such a claim, must "demonstrate a link between the defendant's conduct and evidence of a spiteful purpose or personal hostility."  *Id*.  At this stage in the proceedings, however, the factual content pled need only "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct

8

alleged." *Iqbal*, 129 S. Ct. at 1949.

Plaintiff's allegations, which the court must take a true, assert that Scanlon may have had a hand in creating the typographical errors, that Scanlon participated in meetings during which discussions took place about how to handle those errors and, finally, that Plaintiff suffered an adverse employment action as a result of, and perhaps primarily due to, his handling of those errors at Scanlon's direction.  (Compl. ¶¶ 31, 35, 41, 46.)  Given the fact-specific nature of an "actual malice" inquiry, it is this court's opinion that, at this stage in the proceedings, Plaintiff has alleged sufficient facts to withstand Defendants' motion as it applies to Scanlon.  Accordingly, the court will recommend that Defendants' motion be denied insofar as Count Two is directed at Scanlon.

On the other hand, the court will recommend that Defendants' motion with regard to Count Two be granted insofar as it targets Viviano.  Although the complaint alleges that Viviano also participated in the meetings that apparently dictated how the typographical errors would be handled, his participation is insufficiently described and, unlike Scanlon, there are no allegations regarding his access to Plaintiff's computer, thereby falling short of a claim that requires malice.  In short, unlike the situation with Scanlon, there is no allegation or fair inference that Viviano created the typographical errors and then directed Plaintiff not to change them, actions which, according to Plaintiff, ultimately led to his termination.  Accordingly, it will be this court's recommendation that Defendants' motion, insofar as it seeks to dismiss Count Two against Viviano, be allowed.

C. Intentional Infliction of Emotional Distress (Count Three)

Plaintiff's third claim, intentional infliction of emotional distress, is also directed against both Viviano and Scanlon.  Defendants argue, however, that the court need not address the merits of that claim because it is precluded by the exclusivity clause of the Massachusetts workers' compensation statute, Mass. Gen. Laws ch. 152, which covers injuries shown to have arisen out of and in the course of employment.  *See also Doe v. Purity Supreme, Inc.*, 664 N.E.2d 815, 818 (Mass. 1996), (exclusivity provisions of the workers' compensation statute covers claims where (1) plaintiff is an employee, (2) his condition constitutes a personal injury within the meaning of the workers' compensation statute, and (3) the injury arises out of and in the course of employment).  *Doe* only holds, however, that "any claims seeking to recover against an *employer* for [personal injuries] are barred by the exclusivity provision of the workers' compensation act."  *Id*. at 818 (emphasis added).

Here, Plaintiff's claims are not directed against his former employer but against other employees.  In such instances, the workers' compensation act only provides an "exclusive remedy against co-employees who engage in tortious conduct within the course of their employment and in furtherance of the employer's interest."  *Brown v. Nutter, McClennen & Fish*, 696 N.E.2d 953, 956 (Mass App. Ct. 1998).  The act, therefore, does not immunize co-employees for "tortious acts which they commit outside the scope of their employment, which are unrelated to the interest of the employer."  *Id*. Accordingly, the relevant inquiry here is whether the acts alleged to have caused Plaintiff's distress were carried out by Scanlon and Viviano within the course of their employment.

The course of employment inquiry "is to be broadly construed, so that an injury

10

which arises 'out of the employment looked at in any of its aspects' is subject to the act's exclusivity provision." *Id*. at 955.  In *Brown*, the Massachusetts Appeals Court vacated the dismissal of the plaintiff's intentional infliction of emotional distress claim, explaining that, at that point in the proceedings, it was not clear that the defendant was acting within the course of his employment or for his own personal benefit.  *Id*. at 956. The plaintiff had alleged that the defendant, by threatening suicide and crying, forced her to forge and notarize a personal mortgage document.  *Id*.  The court explained that "the test to be used in determining whether [the defendant] was acting within the course of his employment is an objective one, viz., a test 'which assesses what the employee did and other facts in order to determine whether he acted at least in part for a job-related purpose.'"  *Id*.  (quoting *Mulford v. Mangano*, 636 N.E.2d 272, 275 (Mass. 1994)).  In *Mulford*, the Supreme Judicial Court determined that when deciding whether a co-employee is acting in the course of his employment for purposes of the workers' compensation exclusivity clause, "it is enough if [defendant] is upon his employer's premises occupying himself consistently with his contract of hire in some manner pertaining to or incidental to his employment."  *Id.*, 636 N.E.2d at 275 (quoting *Mulford v. Mangano*, 626 N.E.2d 622, 623 (Mass. App. Ct. 1994)).

Unfortunately for his claim, Plaintiff's complaint readily resolves against him the issue of whether his coworkers' conduct was in the course of employment.  Plaintiff alleges in his complaint that the typographical errors were likely the result of a prank called "blasting," which is "employed as a 'got ya' tactic for not locking one's pc" because, "prior to leaving one's office, it was encouraged to manually lock their systems and limit pc access."  (Compl. ¶¶ 40, 16, 15.)  Given Plaintiff's apparent admission that

11

the pranks that ultimately caused his emotional distress were carried out as a way to encourage computer security in the workplace, he has settled the question of whether the "blasting" pranks that resulted in the typographical errors were "at least in part for a job-related purpose." *Mulford*, 636 N.E.2d at 275.  As a result, Plaintiff's claim falls under the workers' compensation exclusivity clause and he has, therefore, failed to state a "facially plausible legal claim." *Ocasio-Hernandez*, 640 F.3d at 12.

If that were not enough, in looking at Plaintiff's complaint, the court is unable to read the non-conclusory factual allegations as sufficiently stating a claim for intentional infliction of emotional distress.  A plaintiff claiming intentional infliction of emotional distress must establish that the defendant (1) intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of the alleged conduct, (2) that the conduct was "extreme and outrageous" and "beyond all possible bounds of decency,"  (3) that the actions were the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was "severe" and of a nature that no reasonable person "could be expected to endure."  *Thorpe v. Mutual of Omaha Ins. Co.*, 984 F.2d 541, 545 (1st Cir. 1993) (quoting *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19 (Mass. 1976)).  Putting aside whether Plaintiff has adequately alleged facts to support the first two elements of this claim, he has noticeably failed to allege any facts showing that he suffered distress, much less "severe" distress.  Instead, Plaintiff simply states that he "suffered damages" (Compl. ¶ 58) and that "Mr. Viviano and Mr. Scanlin [sic] knew or should have known that their acts and conduct would likely result in Mr. Orioles suffering significant emotional distress"  (Compl. ¶ 57).  Those allegations, in the court's view, are nothing more than "threadbare recitals of the

12

elements of a cause of action," and Plaintiff "is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of a cause of action."  *Ocasio-Hernandez*, 640 F.3d at 12 (quoting *Twombly*, 550 U.S. at 550, 555.).  Accordingly, the court is left with little choice but to recommend that Defendants' motion be allowed as to Count Three.

## IV. CONCLUSION

For the reasons stated, the court recommends that Defendants' Motion for Judgment on the Pleadings be DENIED as to Count One, DENIED as to Defendant Scanlon but ALLOWED for Defendant Viviano with regard to Count Two, and ALLOWED as to Count Three.[1]

DATED:   September 6, 2011


 /s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

---

[1]The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection.  The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation.  *See Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 275 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within ten (10) days after being served with a copy thereof.